**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

December 3, 2013

The Honorable Thomas P. Griesa
United States District Judge
United States District Court for the
   Southern District of New York
500 Pearl Street
New York, New York 10007

      Re:    **United States of America v. Emmanuel Roy**
              **S3 09 Cr. 940 (TPG)**

Dear Judge Griesa:

      The Government writes in advance of the sentencing of Emmanuel Roy, the defendant, which is currently scheduled for December 5, 2013 at 4:00 p.m. The Government respectfully submits that a sentence within the advisory Guidelines range would be sufficient, but not greater than necessary, to comply with the purposes of sentencing.

      On February 1, 2013, the defendant was convicted after a jury trial before Your Honor for his participation in two schemes designed to defraud mortgage lending institutions. Specifically, the defendant was convicted of engaging in a conspiracy to commit wire fraud in violation of Title 18, United States Code, Section 1349, three substantive acts of wire fraud in violation of Title 18, United States Code, Section 1343, and participating in a conspiracy to commit wire fraud and bank fraud in violation of Title 18, United States Code, Section 1349. The United States Probation Office has determined that the defendant has a United States Sentencing Guidelines ("Guidelines") range of 70 to 87 months' imprisonment, and recommends that the defendant be sentenced to 70 months' in prison. (PSR, Pg. 19, 25). The Probation Office's Guidelines calculation is based on a loss amount of $4,228,904, and a two-level increase in the defendant's offense level due to the fact that the defendant was a lawyer who used his education, training, and licensing to further the mortgage fraud schemes in which he participated. (PSR, Pg. 12). The Government respectfully submits that a sentence falling within the advisory Guidelines range of 70 to 87 months' imprisonment is appropriate given both the defendant's conduct, his history, and his characteristics.

  A. <u>Defendant's Offense Conduct</u>

      A sentence falling within the advisory Guidelines range is appropriate given the

defendant's conduct. The defendant was a former New York City prosecutor turned real estate lawyer who specialized in representing buyers and sellers of property in real estate transactions. For several years, he participated in schemes designed to trick banks into issuing mortgage loans based on lies. In one scheme, which is referred to in the Pre-sentence Report as the Joshua Funding Scheme, the defendant and others lied to people to get them to buy houses. Sometimes the group lied to people about the value of the houses. Other times, the group bought property under a person's name without even telling the person. The group just wanted the property sold because they had bought the property and was looking to flip it so they could pocket the difference. To accomplish this goal, the group sought buyers with little real estate experience whom they could take advantage of. Once the group found willing buyers, the group would then lie to mortgage lending institutions about the buyers to make them look like they were qualified for mortgage loans. For instance, the group would lie about the buyers' income, their jobs, and how much money the buyers had in the bank. Based on these lies, the banks issued millions of dollars of mortgage loans to the defendant and his co-conspirators and they split this money up amongst themselves. While the defendant and his group walked away with a portion of the mortgage proceeds, the buyers were stuck with mortgages they could not afford to pay and the banks were left with having lent money that they would not get back.

   The defendant played a critical role in this scheme. He recruited some of the buyers that the group took advantage of. Specifically, he recruited his uncle, a friend of his uncle's, and a friend of his from college. The defendant used his relationship with these individuals, and the respect they had for him as a lawyer, to convince them that they were qualified to buy houses that he knew they could not afford. For example, Roy convinced his uncle, who made a modest salary as a school bus driver, to buy three properties over the course of two months that resulted in him owing approximately $1.69 million dollars in mortgage loans. Roy got his uncle's friend, also a school bus driver, to buy three properties over the course of six months that resulted in him owing approximately $1.774 million dollars in mortgage loans. One of those properties was a property that became Roy's primary residence; Roy had asked his uncle's friend to buy that property for him as a favor. Roy also had his college friend, a bank employee, purchase three properties over the course of five months that resulted in her owing approximately $1.865 million dollars in mortgage loans. Roy acted as her power of her attorney in those transactions and, despite her explicit instructions not to buy any properties without telling her first, two properties were purchased on her behalf without her knowledge.

   The reason Roy's uncle, his uncle's friend, and his college friend were able to obtain these massive amounts of mortgage loans was because Roy's group submitted mortgage loan applications on their behalf that were filled with lies. For example, the loan applications submitted on behalf of Roy's uncle and his uncle's friend stated that they were chefs, not school bus drivers, and listed their monthly income as being far greater than it actually was. Neither Roy's uncle nor his uncle's friend were aware at the time that loan applications had been submitted on their behalf that contained lies. Both testified at trial that they did not fill in the information listed in their loan applications, they just signed them, and they signed them because

Roy told them to. The loan applications submitted on behalf of Roy's college friend claimed that she worked for Roy's law firm, not at a bank, and listed her monthly income as being much greater than it was. Roy's college friend testified that she was also unaware that her loan applications contained lies. In fact, she testified at trial that at the closing of the third property purchased in her name she noticed that her loan application incorrectly stated that she worked as a legal investigator at Roy's law firm and made approximately $10,000 more a month than she actually made. She pointed the incorrect statements out to Roy and he told her not to worry about it and that the statements would be fixed. The statements were not fixed and her application containing those lies was submitted to the lending bank.

In addition to recruiting these individuals and convincing them to buy properties they could not afford, Roy also used his law license to perpetrate the fraud. Roy represented his uncle and his uncle's friend as their attorney at each of the closings associated with the homes they purchased. Roy represented his college friend as he obtained a power of attorney from her. Indeed, the profits Roy obtained from the fraud came from the fees he received for representing the victims as their lawyer. In addition, as mentioned above, Roy's victims trusted him in large part because he was an attorney (a former prosecutor, no less). They did not believe he would be engaged in a fraud, and he used their trust to take advantage of them.

While the lenders suffered the financial losses in connection with the scheme,[1] the defendant's actions took a very significant toll on the victims who he recruited to participate in the fraud. These individuals, who were deceived into purchasing multiple properties that they could not afford, have been devastated financially. Their credit has been ruined and their lives turned upside down by their involvement in the scheme. The defendant knew these individuals personally and knew that they could not afford the properties for which he and his co-conspirators obtained loans on their behalf, but that did not stop him from taking advantage of them.

The second mortgage fraud scheme the defendant participated in is referred to in the Pre-Sentence report as the Coral Mortgage Scheme. This scheme also involved telling lies to banks to get mortgage loans so the defendant and his co-conspirators could divide up the loan proceeds. However, the Coral Mortgage Scheme worked differently than the Joshua Funding Scheme. The Coral Mortgage Scheme did not involve flipping properties to unsuspecting buyers. Instead, the scheme brought together sellers and buyers who wanted to work together to trick banks into lending money. The sellers were generally in financial distress and needed to sell their homes to make money. However, the sellers did not want to move out of their homes, so they agreed to sell their homes in name only. The sellers stayed in their homes, and in return they agreed to split the mortgage loan money with the buyers and other members of the conspiracy. The transactions were complete shams. No money changed hands between the

---

[1] As detailed in the Pre-sentence Report, the total loss caused by Roy for all properties regarding the Joshua Funding Scheme is $4,000,125. (PSR, Pg 9.)

3

buyers and the sellers. The buyer did not make a down payment, and the buyer – the person supposedly paying for the home – was getting a cut out of the mortgage money.

Everyone involved in the scheme was in on it except for the banks. The banks thought the transactions were legitimate and that the buyer was paying a down payment. The reason the banks thought that was because Roy told them that was the case. Roy lied to the banks and told them that the sellers had received the down payment money. That was his role in the scheme. Roy acted as the seller's attorney in these transactions and wrote letters to the lending banks telling them that he had received a down payment from the buyer and placed the down payment money in his escrow account when he had not received any money from the buyer. Roy wrote these letters on the letterhead of the various law firms he was associated with during the course of the scheme. This act was critical to the success of the scheme, as the banks would not close a deal and release the mortgage proceeds unless a down payment was made.[2]

Given the defendant's brazenly fraudulent conduct, and the use of his stature and power as a lawyer to facilitate the commission of the frauds described above, a sentence falling within the Guidelines range of 70 to 87 months' imprisonment is appropriate.

B. Defendant's History and Characteristics

The defendant's history and characteristics also support the imposition of a sentence within the Guidelines range. Separate and apart from the conduct described above, the defendant, acting as an attorney, has participated in immensely fraudulent conduct, time and time again, over the course of nearly half a decade. Much of this conduct came to light in June 2009 when the New York State Supreme Court, Appellate Division, First Department, Departmental Disciplinary Committee ("DDC"), charged Roy with 38 charges, covering six matters. Listed below is a brief summary of each of those matters:

(1)  In or about 2004, Roy was retained to represent a woman in a claim for damages caused by the explosion of a boiler and fire in the building where she occupied an apartment in Brooklyn, New York. (DDC Statement of Charges at 18, 19). Roy failed to take any action to pursue her insurance claim and the statute of limitations for initiating an action on her case expired. (Id.) Shortly thereafter, Roy sent his client a letter informing her that his firm had been dissolved and that he had elected not to continue representing her. (Id.) Subsequently, Roy's client filed a complaint with the DDC. Roy responded by claiming that he did not know who the woman was, that he had never met her, that he never took her case, and that he had never discussed any legal matter with her. (Id.)

---

[2] As stated in the Pre-sentence Report, the estimated loss caused by Roy for all of the transactions in the Coral Mortgage scheme is approximately $228,779. (PSR, Pg 10.)

4

(2)   In or about September 2004, Roy represented a buyer, with whom he had an intimate relationship, in a real estate matter and prepared a contract of sale with the stated sale price listed as $195,000, with no down payment or seller's concession. (DDC Statement of Charges at 3-10). The seller agreed to that sale price and signed the contract. (Id. at 4). Roy then prepared a false contract of sale listing the sale price as $310,000, a down payment of $31,000, and a seller's concession at 6% in the amount of $18,600. (Id. at 5). Roy submitted this false contract in support of the buyer's mortgage loan application. (Id. 5, 6). Based on this false information, the buyer received a loan of $260,400. (Id. at 6). Roy then instructed the title company to transfer the net proceeds of the loan to his personal bank account, which he misrepresented as his attorney escrow account. (Id.) Roy disbursed a net total of $185,800 to the seller and kept the balance for himself and the buyer. (Id. at 7).

(3)   In or about March of 2004, Roy represented a client in an eviction proceeding against a tenant. (DDC Statement of Charges 38-42). Subsequently, the tenant vacated the premises and Roy moved into the tenant's former apartment. (Id. at 38). Several of Roy's rent checks were dishonored by the bank and he was eventually asked to vacate the apartment. (Id. at 39). After moving out of the apartment, Roy held on to the keys for approximately four months. (Id. at 40). Roy's landlord, and former client, filed a holdover petition and received a judgment against him in the amount of $8,700 for unpaid rent. (Id. at 41).

(4)   In or about November 2005, Roy applied for a credit card in the name of his then law partner, Adewole Agbayewa, without his permission. (DDC Statement of Charges 15-17). The application listed Agbayewa's name, date of birth, Social Security number, and employment information, and listed Roy as an additional card member. (Id.)

(5)   In or about 2006, Roy represented the seller of a building containing tenants in which he entered into an agreement with the buyer requiring him to hold $10,000 in escrow to ensure that one of the tenants vacated the building by a certain date and that certain repairs would be done by the seller. (DDC Statement of Charges at 20-33). Roy dispersed of the funds held in escrow before the tenant vacated the building and before the specified repairs had been completed. (Id. at 22) Subsequently, the buyer filed a claim in Small Claims Court against Roy due to his breach of their agreement. (Id. at 24-25). Roy made material misrepresentations to the Small Claims Court, including claiming that he had not been served with notice of the seller's claim. (Id. at 25-27).

  (6)  In or about 2006, Roy improperly used the name "Roy & Associates" as the name of his law firm, as he had no associate attorneys. (DDC Statement of Charges at 43-45). In addition, he did not maintain an accurate ledger or similar book of accounts. (Id. at 44). Moreover, he frequently wrote checks to himself with the notation "Legal fees" on the memo line without identifying the client matter involved. (Id. at 45).

  A hearing on the disciplinary charges was held on November 10, 2009. Shortly thereafter, Roy advised the DDC that he wished to resign from the bar. In his affidavit of resignation, sworn to on November 30, 2009, Roy acknowledged that he could not successfully defend himself against the pending charges. On February 18, 2010, the New York State Supreme Court, Appellate Division, First Department, accepted Roy's resignation and struck his name from the roll of attorneys. The First Department's opinion ruling on the DDC's charges is attached as Exhibit 63 and the DDC's statement of charges is attached as Exhibit 65.

  As egregious as the conduct described above is, perhaps the most horrendous example of the defendant's inclination to use his position and power as a lawyer to defraud people and institutions was detailed by Magistrate Judge William C. Turnoff of the United States District Court for the Southern District of Florida in an opinion he issued on September 16, 2011. In that opinion, Judge Turnoff detailed conduct committed by Roy while acting as a lawyer for a criminal defendant in a case before the Southern District of Florida that Judge Turnoff described as "the most outrageous in his 25 years on the bench and before that". (Turnoff Op. 29) (internal quotations omitted). Judge Turnoff's opinion is attached as Exhibit 67.

  Judge Turnoff's opinion relates to Roy's representation of an individual named Patrick Coulton who had been arrested on March 11, 2008, after being indicted on charges of various drug and money laundering offenses. (Turnoff Op. 1, 3). Roy represented this individual with another lawyer named Peter Mayas. (Id. at 1). On May 14, 2008, Coulton pled guilty, and on July 28, 2008, he was sentenced to a term of 168 months' imprisonment. (Id.) Coulton then hired a new attorney, Paul D. Petruzzi, and filed a Motion for Return of Unearned Legal Fees and Imposition of Sanctions relating to Roy and Mayas's representation of him. (Id.) The Court invoked its ancillary jurisdiction pursuant to Title 28 of the United States Code, Section 1367(a), to adjudicate Coulton's fee dispute with Roy and Mayas. The court held an evidentiary hearing on January 14, 2011. (Id. at 2.) Neither Roy nor Mayas attended the hearing. (Id.) The defendant called three witnesses, his wife, Pamela Coulton, his aunt, Zennabelle Sewell, and his cousin, Allison Reid. (Id.) The defendant also introduced 17 exhibits. (Id.) Judge Turnoff found the witnesses credible and their testimony corroborated by the exhibits and the record. (Id. at 2, 3). As such, the Judge granted the defendant's Motion for Return of Unearned Legal Fees and Imposition of Sanctions, ordered Roy to return all monies, real property, and personal property obtained from Coulton and his family, in the amount of

$275,800, and held Roy and Mayas, and their respective law firms, in contempt of court and imposed several sanctions against them.  (Id. at 27).

Below is a summary of some of the findings of fact Judge Turnoff made following the evidentiary hearing:

Roy was retained by Mrs. Coulton to represent Patrick Coulton on March 12, 2008.  (Turnoff Op. 4).  The fee agreement stated that the fees would be calculated at the rate of $600.00 per hour, that a down payment of $150,000.00 was required, and that any modification to the agreement must be in writing and signed by the attorney and the client.  (Id. at 3, 4).  Before signing the agreement, Mrs. Coulton indicated to Roy that she did not have any money but did have jewelry, to which Roy responded that he would accept jewelry as payment.  (Id. at 3).  Subsequently, after being retained, Roy obtained the Coultons' jewelry from their home.  (Id. at 4, 5).  During this same time period, Roy began discussing fee arrangements with other members of the Coulton family, unbeknownst to Mrs. Coulton.  (Id. at 5).  Specifically, Roy talked with Mrs. Sewell about how much it would cost to represent Coulton and told her that he needed to be paid by cashier's check.  (Id.)  Mrs. Sewell, Mrs. Reid, and other family members then pooled funds from their savings accounts, pension plans, and a credit union loan to pay legal fees to Roy.  (Id.)  Mrs. Sewell provided the defendant with cashier's checks totaling $83,000.00.  (Id.)  Roy did not advise her that he was also obtaining jewelry, approximately $55,800 worth, and other assets from Mrs. Coulton as payment towards Coulton's legal fees.  (Id. 5, 6).

Subsequently, on March 19, 2008, Roy and his wife traveled to London, England to meet with Mrs. Coulton in person, as she was living in London at the time.  (Id. at 6).  Roy had two brief meetings with Mrs. Coulton in London.  (Id.)  At the end of the first meeting, Roy told Mrs. Coulton to hand over her wedding ring as payment for his legal fees.  Mrs. Coulton reluctantly complied.  (Id.)  The ring set was valued at $23,000.  (Id.)  Roy then told Mrs. Coulton that he knew she owned a condo in Florida and that she needed to sign it over to him.  (Id.)  Mrs. Coulton replied with Roy's request by signing a deed conveying the property to Roy's wife.  (Id. at 7)  Roy and his wife returned to the United States on March 24, 2008.  (Id.)

On March 24, 2008, Roy and Mayas filed a joint notice of appearance as counsel for Coulton. (Turnoff Op. 7).  According to the docket, the notice was filed by Megan Renze, Esq., via the Court's CM/ECF filing system.  (Id.)  According to Ms. Renze, neither Roy nor Mayas had permission to use her account.  (Id.)  The next day, a second, hand-signed notice of appearance was filed by Roy and Mayas.  (Id.)  A hand-signed stipulation for substitution of counsel was filed the following day using the CM/ECF identification belonging to Ms. Renze.  (Id.)  At the time Roy and Mays filed their joint notices of appearances and filed their Motion for Substitution of Counsel, neither had been admitted to the Southern District of Florida.  (Id. at 8).  In fact, both had been notified by the Clerk of the Court on multiple occasions that they were not members of the bar of the Court as they had previously appeared as counsel in the District on unrelated cases.  (Id.)  Roy never informed Coulton, his wife, his family, the Court, or the

Assistant U.S. Attorney assigned to Coulton's case that he was not authorized to appear as counsel in the District.  (Id.)  In fact, he actually lied to Coulton's family informing them that he was not only a former Assistant District Attorney in Florida, but that he had previously worked with the AUSA assigned to the case.  (Id.)

As Coulton's case continued, Roy continued to solicit payment from both Mrs. Sewell and Mrs. Coulton.  (Id. at 9).  At no point did Roy either advise Mrs. Sewell that Mrs. Coulton had paid him already with jewelry and a condo, or advise Mrs. Coulton that Mrs. Sewell had been paying him with cashier's checks.  (Id.)  Instead, Roy continued to lie to both of them to extract money from the Coulton family.  For example, Roy told Mrs. Coulton that she had been indicted but that he was getting the charges dropped, when there were no charges against her.  (Id. at 10)  He also told Mrs. Coulton that he could get her husband a sentence of five years or less, when his plea agreement clearly stated otherwise.  (Id.).  Roy even lied to Mrs. Coulton to take possession of her car, a Porsche Cayenne Sport Utility Vehicle that had been seized by the government, but returned to her.  (Id. at 9.)  Roy falsely told Mrs. Coulton that the court had awarded him her car, valued at $40,000, as fees in the case.  (Id.)  Roy then had the vehicle signed over to his wife.  (Id. at 9, 10).  Later, Roy and his wife picked the car up in Georgia and drove it back to their home in New York.  (Id. at 9, 10).

Coulton was ultimately sentenced to a term of 168 months' imprisonment.  (Id. at 11).  Coulton was represented at his sentencing by Roy and Mayas, despite the fact that neither one of them was authorized to practice before the District Court.  (Id.)  After hiring new counsel, Paul D. Petruzzi, Coulton's sentence was eventually reduced to 84 months in light of a motion filed by the Assistant U.S. Attorney assigned to the case to reduce Coulton's sentence pursuant to Federal Rule of Criminal Procedure 35, in light of Coulton's cooperation with the government.  (Id. at 12).

* * *

Emmanuel Roy used his law license and his stature as a lawyer to steal money from mortgage lending institutions.  He did this several times over the course of several years.  He did this in spite of the fact that his actions were causing the financial ruin of his friends and family members.  And for what?  Money.  As a result of his greed, he and others like him have made a lasting impact on the lending process, and on the lives of the individuals used as pawns in mortgage fraud schemes.  Emmanuel Roy, and other lawyers who defraud or nation's lending

institutions should be punished. Accordingly, the Government respectfully requests that a sentence falling within the advisory Guidelines range of 70 to 87 months' imprisonment be imposed.

                                                 Sincerely,

                                                 PREET BHARARA
                                                 United States Attorney

                                               By:_____/s/_____

cc:    Raymond Sussman, Esq.             Robert L. Boone
                                                  Assistant United States Attorney
                                                  Southern District of New York
                                                  (212) 637-2208